# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
# MARTINSBURG

**JOHN S. DESMOND,**
**DANA E. WITHERSPOON, and**
**LARRY SANDERS,**

    Plaintiffs,

v.                                    **Consolidated Civil Action Nos.**
                                             **3:06-CV-128 -129 -135**
                                             **(Judge Bailey)**

**PNGI CHARLES TOWN GAMING, LLC**
**d/b/a CHARLES TOWN RACES & SLOTS,**

    Defendant.

## MEMORANDUM OPINION AND ORDER

The Court has pending before it plaintiffs' Motion for Partial Summary Judgment as to Count I of the Plaintiffs' Amended Complaints [Doc. 37] and Defendant's Motion for Summary Judgment [Doc. 77]. At issue are claims alleging violations of the overtime provisions of the Fair Labor Standards Act ("FLSA") and the West Virginia Wage Payment and Collection Act. The motions have been fully briefed and are now ripe for decision.

The plaintiffs filed the above-styled actions on November 20, 2006, alleging defendant PNGI Charles Town Gaming, LLC ("PNGI") willfully failed to fully compensate the plaintiffs for hours worked in excess of forty (40) hours, i.e., "overtime," pursuant to their alleged "non-exempt" status. Because their positions as Racing Officials clearly meet the requirements of the administrative exemption to the FLSA, they are not entitled to overtime pay, and summary judgment must be granted in favor of the defendant. Additionally,

because the plaintiffs were never entitled to overtime pay, the Court finds that Count II of the Complaint, in which the plaintiffs seek collection of overtime compensation under the West Virginia Wage Payment and Collection Act, W. Va. Code § 21-5-4, to be moot.

## I. Factual and Procedural History

The plaintiffs, three former Racing Officials, were fired from Charles Town Races and Slots ("CTR&S) on September 15, 2006, for unanimously declaring the wrong horse the winner of a race while serving in their capacities as Placing Judges. When several horsemen and jockeys had questioned the integrity of the Placing Judges, a protest was lodged, and the Stewards found that they were careless in determining the winner of the race. The three often worked at CTR&S in excess of forty (40) hours in a week, but were never paid overtime.

The primary purpose of the Racing Official is to assist in governing and regulating the thoroughbred horse racing general business operations of CTR&S and to protect the integrity of thoroughbred horse racing, in accordance with West Virginia law. These Rules of Racing, as well as CTR&S's own job descriptions, provide a summary of what these positions entail. As Racing Officials, the plaintiffs worked in the position of Entry Clerk and rotated through the positions of Horse Identifier, Paddock Judge, Placing Judge, and Clerk of Scales. Each of these positions requires the performance of non-manual work. Racing Officials are not subject to direct supervision, but are subject to general supervision by the Racing Secretary and the Board of Stewards. Additionally, these positions exercise no supervisory responsibilities over other employees; however, they do essentially supervise the activities of the race participants and that of the race itself.

Depending upon the racing schedule, the plaintiffs worked mornings as Entry Clerks in the Racing Secretary's office. This work included producing the next racing day's program, filing the entries on the racing card, making rider changes, and compiling and entering information electronically for the "overnight," or racing program. In the process of taking entries for a race, computer data may indicate that a horse is ineligible to race because it is on a "Vet's list," a "bleeder's list," or a "Stewards' list." In such a case, the owner or trainer proposing the horse for entry may challenge the horse's placement on that list. In the even of a challenge, the Entry Clerk may either recognize the violation and refuse to accept the entry, or conduct a further investigation to determine whether the horse's listing was in error or the horse had been removed from the list. The Entry Clerk may override the horse's ineligible status and allow the entry if the listing was in error, if the violation has been removed, or if other circumstances exist.

Next, during live racing, which occurs mostly at night and Sunday afternoons, the plaintiffs worked as Horse Identifier, Paddock Judge, Placing Judge, or Clerk of Scales. In the two years prior to this lawsuit, the plaintiffs worked primarily as Paddock Judges and Placing Judges during race hours.

First, the Horse Identifier's duties include confirming the proper identification of each horse scheduled to compete on that evening's racing card. If the horse's tattoo and/or its markings do not match the official records and foal papers, and the Identifier suspects fraud, he/she may recommend to the Board of Stewards that the horse be disqualified.

Next, the Paddock Judge supervises the assembling of the horses in the paddock, the saddling of the horses, and their departure to the starting gate. Additionally, the Paddock Judge is involved in seeing that a published workout is in the program or

3

announced if not available by press time. These duties include observing the horses in the paddock prior to the race and ensuring that the horses are wearing the proper equipment for racing. Further, if a horse's temperament and demeanor are such that it is likely to create a safety or health risk to itself, its jockey, or other persons and horses, the Paddock Judge has the authority to recommend to the Board of Stewards that the horse be disqualified from the race. This recommendation is afforded great weight because the Stewards are not in a position to physically observe a horse's demeanor, and only fifteen minutes separates the conclusion of one race and the beginning of the next race.

Next, the Clerk of Scales works in the jockeys' room before and after each race. He or she verifies each jockey's presence and licensure and moniters weight and color alterations. The Clerk of Scales also observes each jockey during weighing and judges the fitness of the jockey to ride. If a jockey appears to be injured, under the influence of alcohol or drugs, or engaged in any other unlawful horseplay, the Clerk of Scales may ask that jockey to see CTR&S' nurse and/or recommend to the Board of Stewards that the jockey be disqualified. Further, if the Clerk of Scales suspects questionable weight discrepancies between the jockey's weighing in or out, the Clerk must report the findings to the Board of Stewards.

Lastly, three Placing Judges occupy the judges' stand to observe the race from start to finish and to determine the order in which the horses finish. The Placing Judges determine the race position of the top four horses as the race is run; these calls are entered on the electronic tote board every few seconds. The Placing Judges then determine the order of finish of all of the horses, and in the event of an apparent "dead heat," difficulty in identifying the horse and rider, or other doubt involving the proper order of the top finishers,

the Placing Judges may use a photo finish system, called a viper, to assist them. When the Placing Judges' individual placements conflict, majority rules. Their decisions are final, subject to objection or protest to the winner or any horse officially placed made, which can be sustained by the Stewards. The outcome of wagers made by patrons, which can be significant, the payment of purses to owners and trainers, and compensation to jockeys, depends upon the order of finish. Additionally, the races are broadcast live, via simulcast, to other race tracks, where bets also depend upon the order in which the Placing Judges find them.

## II. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[2] Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[3]

---

[1] FED. R. CIV. P. 56(c); see **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986).

[2] **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 250 (1986).

[3] **Anderson**, 477 U.S. at 250.

Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."[4] That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial.[5] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[6]

As the party invoking the exemption to the FLSA overtime provisions, the burden of proving all elements necessary to establish such an exemption is upon the defendant. ***Idaho Sheet Metal Works, Inc. v. Wirtz***, 383 U.S. 190 (1966). As such, it is the defendant's burden to establish that the plaintiffs fall squarely within the administrative exemption, and all doubts concerning this must be resolved in favor of the plaintiffs. "We have held that these exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." ***Arnold v. Ben Kanowsky, Inc.***, 361 U.S. 388, 392 (1960). The standard of such proof is clear and convincing evidence, not a mere preponderance.[7] ***Shockley v. City of Newport News***, 997 F.2d 18 (4th Cir. 1993).

---

[4] ***Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 586 (1986).

[5] Fed. R. Civ. P. 56(c); ***Celotex Corp.***, 477 U.S. at 323-25; ***Anderson***, 477 U.S. at 248.

[6] ***Anderson***, 477 U.S. at 249 (citations omitted).

[7] The defendant cites ***Yi v. Sterling Collision Ctrs., Inc.***, 480 F.3d 505 (7th Cir. 2007) for the incorrect proposition that a "preponderance of the evidence" is the appropriate burden of proof used in the Fourth Circuit for assessing the requirements of the FLSA's administrative exemption.

The Plaintiffs' Amended Complaints [Docs. 27, 28, and 29] each contain three counts: Count I alleges that the defendant failed to pay the plaintiffs overtime wages at a rate of one-and-one-half times their regular pay rate for hours worked in excess of forty (40) per work week; Count II alleges that the same failure to pay overtime also violated the West Virginia Wage Payment and Collection Act; and, Count III, which alleged a second violation of the Wage Payment and Collection Act for unpaid vacation days, has been abandoned. [*See* Doc. 75].

As an initial matter, so as not to put the cart before the horse, this Court must address the issue plaintiffs raise as to whether or not the defendant's own FLSA classifications are dispositive. In support of this proposition, plaintiffs assert that the defendant's job description classifies all of the relevant positions as "non-exempt." In *Fields v. AOL Time Warner, Inc.*, 261 F.Supp.2d 971, 975 (2003), an employee who drafted the company job descriptions submitted a declaration, which stated that she used the non-exempt designation only to indicate that the position was a lower level entry position and not a salaried, executive position. In that case, the Court found that

> "while the label of 'non-exempt' may be evidence that a position is not exempt, such a label is not dispositive. Instead, the actual job duties and actions performed by the employee are dispositive. This is especially true in a case such as this where defendants have proffered a legitimate explanation for the use of the 'non-exempt' label in the internal job description." *Id*.

This Court agrees. In this case, PNGI contends that the original notations upon the job descriptions, which were determined in 1999 by Human Resources Director Margaret

7

Patterson based upon computer software[8], are erroneous and have been inadvertently carried forward with each revision thereof. Accordingly, this Court finds it necessary to investigate the "actual job duties and actions" of a Racing Official to determine the true exemption status. *Id*.

### III. Applicable Law

Federal law requires employers to pay their employees a statutory minimum wage and overtime pay for hours worked in excess of the statutory maximum. *See* 29 U.S.C. §§ 206, 207. The FLSA exempts, however, "any employee employed in a bona fide . . . administrative . . . capacity . . . as . . . defined . . . by regulations of the Secretary [of Labor]." 29 U.S.C. § 213(a)(1).

The term "'employee employed in a bona fide administrative capacity' has been fleshed out, as the FLSA contemplates, by detailed Labor Department regulations." ***Gilliam v. Montgomery Ward & Co., Inc.***, 121 F.3d 698, *2 (4th Cir. 1997). These regulations provide both a "long test" and a "short test" for determining whether an employee falls within the exemption. *See* 29 C.F.R § 541.2 (1996). This Court finds that, so as not to beat a dead horse, the short test will be more than sufficient for the analysis at hand. Under the short test, "an employee who is compensated . . . at a rate not less than . . . $455 per week . . . and whose primary duty consists of [office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers] . . . which includes work requiring the exercise of discretion and independent judgment, [is] deemed to [be in that exempt status]." *Id*. at § 541.2(e)(1) and

---

[8] *Description Now! for Windows.*

(e)(2).

The parties do not dispute that the first element of the test is met because the Racing Officials were paid a salary in excess of $455 per week. Accordingly, the Court turns to the second and third elements "primary duty" and "the exercise of discretion and independent judgment."

## IV. Discussion

### A. The plaintiffs' primary duty was the performance of non-manual work directly related to the management or general business operations of Charles Town Races & Slots.

In order to qualify for the administrative exemption, an employee's "primary duty" "must be the performance of exempt work." 29 C.F.R. § 541.700(a). The regulations state that "'primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). To determine the primary duty, one looks to "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id*.

The key elements of this test, "primary duty" and "exercise of discretion and independent judgment," have been further fleshed out. As to "primary duty," the regulations provide that "[i]n the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time." *Id*. at § 541.103. The regulations then caution that:

> Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other

> pertinent factors support such a conclusion. Some of the pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

29 C.F.R. § 541.103.

Racing Officials perform both clerical duties in the morning, and nonclerical Racing Official duties in the evenings. The question then becomes whether the "principal, main, major, or most important duty" these individuals perform is the clerical work, or the evening Racing Official duties (i.e., working as Placing Judges, Paddock Judge, etc.).

This Court agrees that the "primary purpose of the Racing Official is to assist in governing and regulating the thoroughbred horse racing general business operations of CTR&S and to protect the integrity of thoroughbred horse racing, in accordance with West Virginia law." (Moore Aff., Ex. A at ¶ 3). The position thus exists to ensure that the races are fair and that race conduct complies with state regulations.

The plaintiffs argue that the primary duty is ambiguous given the roughly equal amount of time spent in morning clerical duties and evening non-clerical duties. However, as address above, the roughly even balance of time between morning and evening duties is only one factor at which courts look. *See* 29 C.F.R. § 541.700(a). The regulations clearly state that time alone is not the only consideration for determining an employee's primary duty, and that nothing in this section requires that exempt employees spend more than fifty (50) percent of their time performing exempt work. Rather, the regulations state

that, in addition to the amount of time spent performing exempt work, the Court should consider such factors as "the relative importance of the exempt duties as compared with other types of duties" and "the employee's relative freedom from direct supervision." 29 C.F.R. § 541.700(a). Both of these factors point to the live race duties as being primary.

The Racing Official position exists because state regulations require that the "racing official" duties (e.g. Placing Judge, Paddock Judge, Identifier, etc.) be performed at all thoroughbred race tracks. *See* W.Va. Code State R. § 178-1-1, *et seq.* Their relative importance when compared to the clerical morning duties associated with filling the race cards are comparatively much greater. The Racing Officials virtually perform their duties independently and free from direct supervision, subject only to the Board of Stewards and the Racing Secretary, both of whom possess general supervisory roles over them.

Next, the defendant must show that these primary duties are "directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). The regulations explain that to meet this requirement, an employee must perform "work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." Id. at § 541.201(a).

This Court finds that the Racing Official's position, which is required and regulated by the State of West Virginia, is critical for the employer to be able to conduct its business. Simply put, the defendant could not conduct its business legally without them.

CTR&S's 4,500 slot machines are authorized through the Racetrack Video Lottery Act, W. Va. Code § 29-22A-1, *et seq.* This Act states that "[t]he state lottery commission is authorized to implement and operate video lottery games at pari-mutuel racing facilities

in this state in accordance with the provisions of this article and the applicable provisions of article twenty-two [§§ 29-22-1 *et seq.*] of this chapter." W. Va. Code § 29-22A-4. Without a pari-mutuel racing license, CTR&S would only be permitted five (5) video lottery machines under the Limited Video Lottery Act. W. Va. Code § 29-22B-1101. In order to conduct pari-mutuel thoroughbred racing, CTR&S must employ Racing Officials. *See* W. Va. Code of State Rules § 178-1-9.1. Without Racing Officials, no racing could take place, and without racing, there could not be 4,500 slot machines at CTR&S. Therefore, the Racing Officials play a critical role in the entire business operation, and not merely the racing operations.

Likewise, the plaintiffs attempt to use the relatively small portion of PNGI's income drawn from the live horse-racing in to prove that the Racing Officials' duties are not related to its general business operations. This argument, however, fails because the Act was not intended to exclude those duties which are related only to the operation of a particular segment of the business. *See* 29 C.F.R. § 541.202(b). This is especially important in a case such as this, where existence of the larger, more profitable segment of the business relies almost entirely upon the so-called "smaller" portion.

Additionally, the regulations explain that "work directly related to the management or general business operations of the employer" includes "work in functional areas such as … quality control; … safety and health; … public relations; … government relations; … [and] legal and regulatory compliance…." 29 C.F.R. § 541.201(b). The Racing Officials are involved in quality control and public relations insofar as they act as judges to preserve the integrity and fairness of horse racing for the public. If this integrity was compromised

12

patrons would stop wagering, and the business would collapse.

The position also has a substantial safety and health component. Horse racing is a dangerous business. As Clerk of Scales, the Racing Official is responsible for observing each jockey during weighing and judges the fitness of the jockey to ride. If a jockey appears to be injured or under the influence of alcohol or drugs, the Clerk of Scales may request that the jockey see CTR&S' nurse and/or report the jockey's condition to the Board of Stewards, recommending that the jockey be disqualified. As Paddock Judge, the Racing Official observes a horse's temperament and demeanor, before and after it is saddled. If the behavior is such that the horse is likely to create a safety or health risk, the Paddock Judge will recommend to the Board of Stewards that the horse be disqualified.

As the West Virginia Code of State Regulations demonstrates, the conduct of live pari-mutuel racing in this state is heavily regulated. The Rules of Racing mandate the existence of the racing official positions. W. Va. Code of State R. § 178-1-9.6. The rules provide that "[t]he Racing Commission, in its sole discretion, may determine the eligibility of a racing official and, in its discretion, may approve or disapprove any official for an occupational permit." *Id*. The rules are clear that the Racing Officials act within the jurisdiction of the Racing Commission. *See* W. Va. Code State R. § 178-1-9.9. Thus, the position of Racing Official has a regulatory compliance aspect in that CTR&S must have racing officials to comply with the law, and a governmental relations aspect insofar as the law requires an ongoing licensure relationship between racing officials and the Racing Commission without horse racing, CTR&S could not operate its 4,500 slot machines that bring in most of its revenue.

### B. The plaintiffs' positions "include[d] work requiring the exercise of discretion and independent judgment."

The regulations emphasize several critical points concerning this final element of the administrative exemption test, in which the employee's "primary duty include[s] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). The regulations note that "[i]n one sense almost every employee is required to use some discretion and independent judgment," 29 C.F.R. § 541.207(d)(1); however, they stress something more specific and important than such run-of-the-mill exercises of discretion and independent judgment is intended. They point to certain distinctions between that which is intended and the mere "use of skill in applying techniques, procedures, or specific standards," as well as that which is intended and the "making [of] decisions relating to matters of little consequence." 29 C.F.R. § 541.207(b).

With respect to the degree of importance of the matters involved, the regulations emphasize that the discretion and independent judgment they contemplate "must be real and substantial, that is, ... exercised with respect to matters of consequence." 29 C.F.R. § 541.207(d)(1). "Matters of consequence" do not include "the kinds of decisions normally made by clerical and similar types of employees," and while they obviously would include "the kinds of decisions normally made by persons who formulate or participate in the formulation of policy within their spheres of responsibility ... the exercise of discretion and independent judgment at so high a level [is not required]." 29 C.F.R. § 541.207(d)(2). Nor, to involve "matters of consequence," need the exercise of discretion and independent judgment "have a finality that goes with unlimited authority and a complete absence of review." Instead, it may "consist of recommendations for action rather than the actual

14

taking of action," and "[t]he fact that an employee's decision ... upon occasion [is] revised or reversed ... does not mean that the employee is not exercising discretion and independent judgment" of the type contemplated. 29 C.F.R. § 541.207(e)(1).

According to the Department of Labor's regulations, "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). The regulations indicate that "[t]he phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202(b). Among the factors to be considered are whether the employee "carries out major assignments in conducting the operations of the business;" whether the work "affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;" and whether the employee "has authority to commit the employer in matters that have significant financial impact." 29 C.F.R. § 541.202(b).

Occasionally, the outcome of a race is disputed or challenged. In such situations, the Placing Judges take additional steps to determine the order of finish. "If in doubt of the proper order of finish, they may delay posting the result until after they examine the photo of the finish of the race to determine the positions of the horses." W. Va. Code State R. § 178-1-13.1. Such work clearly entails "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a).

The Plaintiffs argue that determining the order of finish involves no judgment or

15

discretion. However, the plaintiffs were fired because they unanimously declared an order of finish that was regarded as incorrect by management. Their circumstances prove that there is more than one way to call a race, and that one person's judgment (or in their case, three) may not comport with another's, even though all of them base their decisions on the same facts. The racing regulations even acknowledge that the discretion and independent judgment involved in these duties can cause differences of opinion to arise. They provide that "[w]hen the placing judges differ on the order of finish, the majority governs." W. Va. Code of State R. § 178-1-13.2. Clearly, the Racing Officials, in their role as Placing Judges, make discretionary judgment calls about the facts as they see them.

Furthermore, their collective judgment is independent, as the regulations provide: "Decisions are final, unless an objection to the winner or any horse officially placed is made and sustained." *Id*. In acting as placing judges, these employees clearly have the "authority to commit the employer in matters that have significant financial impact." 29 C.F.R. § 541.202(b). The discretion exercised by the Placing Judges is not in regard to some trivial matter, as it often involves large sums of money. Aside from the monetary importance, the integrity of horse racing depends on their decisions, and in the contests they decide. Importantly, the fact that the plaintiffs all lost their jobs based on their misjudgment of the outcome of a race shows the shear significance of their decisions.

Similarly, the Racing Officials exercise discretion and independent judgment when acting as Paddock Judges. The role of the Paddock Judge is to assemble the horses and check their equipment and behavior before allowing them to enter the starting gates and participate in a race. If the horse's equipment and behavior are not proper, then, in his discretion, the Paddock Judge can order corrective changes. Paddock Judge can

completely disqualify a horse from a race if the horse is agitated or exhibiting improper behavior. The fact that his recommendations are generally followed by the Stewards is consistent with exempt status under the FLSA regulations. *See* 29 C.F.R. § 541.202(c). Thus, this Court finds that the plaintiffs' duties were "major assignments in conducting the operations of the business," and are ones that "affect business operations to a substantial degree[.]" 29 C.F.R. § 541.202(b).

### V. Conclusion

Based on the foregoing, it is the opinion of this Court that the plaintiffs' Motion for Partial Summary Judgment as to Count I of the Plaintiffs' Amended Complaints **[Doc. 56]** should be, and is, hereby **DENIED**. Further, the Defendant's Motion for Summary Judgment **[Doc. 77]** is hereby **GRANTED** for the reasons stated in this Opinion. Accordingly, the plaintiffs' Amended Complaints **[Docs. 27, 28, & 29]** are **DISMISSED** and **ORDERED STRICKEN** from the active docket of this Court. As such, plaintiffs' Motions in Limine **[Doc. 92]**, defendant's Motion in Limine **[Doc. 100]**, and defendant's First Motion for Extension of Time to File **[Doc. 83]**, and plaintiffs' Motion to Strike Defendant's Expert Witness **[Doc. 57]**, are hereby **DENIED as moot**. As a final matter, this Court **ORDERS** that these rulings shall also apply to all related cases; i.e., **3:06-cv-129** and **3:06-cv-135**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** January 14, 2008.

JOHN PRESTON BAILEY
UNITED STATED DISTRICT JUDGE